UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

| | |
|---|---|
| **ESTATE OF NICHOLAS EUGENE MCMAIN** | **PLAINTIFF** |
| v. | No. 4:19-cv-41-BJB |
| **CITY OF HARTFORD, KENTUCKY, ET AL.** | **DEFENDANTS** |

\* \* \* \* \*

## MEMORANDUM OPINION & ORDER

Nicholas McMain tragically died when he fell from a garbage truck while on prison work-release duty. He was an inmate at the Ohio County Detention Center in Hartford, Kentucky. OCDC operated a voluntary work-release program in which prisoners could perform jobs in the community in exchange for sentence reductions. The jailer, Gerry Wright, approved McMain for the program. On September 5, 2018, a deputy jailer selected McMain to work on the truck, whose layout required McMain to stand on an outdoor platform. A few hours into his shift, McMain fell from the truck as it was turning into a parking lot. McMain suffered serious injuries, was transported to Vanderbilt Medical Center, and died several hours later.

McMain's Estate now seeks damages from several defendants connected to the work-release program, including Wright, the City of Hartford, Chad Wood (the driver of the garbage truck), Jason Geary (the city maintenance supervisor), and George Chinn (the mayor of Hartford). The Estate alleges that these defendants violated McMain's Eighth Amendment rights under the United States Constitution and his right to be free from "absolute and arbitrary power" over his life under Section 2 of the Kentucky Constitution, and that they negligently harmed him under state tort law. The Estate asserts three bases for relief: (1) it was dangerous to send McMain out on work detail because of his medical ailments, (2) McMain was injured because the defendants did not properly train him to ride the truck or provide him with safety equipment, and (3) Wood negligently drove the truck.

Two sets of defendants have moved in parallel for summary judgment—the jailer (Gerry Wright) through one motion and the city defendants (the mayor, maintenance manager, garbage-truck driver, and the City of Hartford itself) through another. The record shows no dispute of material fact that could support Eighth Amendment liability for any defendant. And it likewise shows that the state-law claims are foreclosed under Kentucky law—whether because of official immunity, the

lack of a cause of action for damages, or the lack of record evidence sufficient to create a genuine issue of material fact. The Court therefore grants summary judgment on all claims for all defendants.

## I. The Factual Record

### A. Work Program

At the time of his death, McMain was serving a six-month misdemeanor sentence at OCDC. McMain was on good terms with the prison staff, including the jailer, Gerry Wright. Wright Deposition, (DN 66) at 26–27.[1] Shortly before McMain's death, Wright approved his request to participate in OCDC's work-release program. *Id.* This program allowed inmates to volunteer to perform work for the City of Hartford in exchange for sentence reductions. Jameson Deposition (DN 68) at 12–13. The city operated the program for many years under an informal arrangement that OCDC and the city never memorialized in any detailed agreement. Wright Deposition at 50. The mayor couldn't remember the City Council ever approving any contracts or agreements authorizing the use of inmate labor. Chinn Deposition (DN 63) at 15. This is despite a provision of Kentucky law which requires a jailer to "write a policy governing prisoners working on community-service-related projects" and receive approval from the county's fiscal court. KRS 441.125. OCDC did maintain a brief policy stating that inmates would have the opportunity for meaningful work; nothing in the record, however, indicates that this or any other policy was approved by the city or the county. OCDC Jail Release Policy (DN 74-9).

Under the program as written and practiced, the jail released inmates to perform several different tasks for the city maintenance department, including mowing, weeding, and garbage collection. Chinn Deposition at 8. The day-to-day operation of the work release program was handled jointly and informally by OCDC and the city maintenance office; the city council and the mayor's office did not select or train inmate workers or directly involve themselves in any other aspect of the program. *Id.* at 13–16. Inmates who worked had to volunteer and receive approval from the jailer. Jameson Deposition at 13. And the government didn't punish prisoners for refusing to sign up for work release. *Id.* at 15–16; Geary Deposition (DN 64) at 24.

OCDC determined who on the work-release list was physically and mentally capable of performing the particular maintenance work available on a given day. Geary Deposition at 18–19; Chinn Deposition at 20–21. Once the jail signed over the inmate to the city maintenance department, however, the city (not OCDC) was responsible for training, equipping, and supervising the prisoner-laborers. Chinn

---

[1] The facts set out in this section reflect unrebutted evidence the various parties have identified in their summary-judgment papers.

2

Deposition at 16–17. The record of injuries associated with the work-release program is minimal: apparently only a single previous instance of an injury to an inmate on garbage-truck duty, in which a needle protruding from a garbage bag poked an inmate. Wright Deposition at 51.

### B.  McMain's Health and Work-Release Activity

Until the week of his death, McMain had never participated in garbage collection (or any other work) as part of the prison work-release program. *Id.* at 57. But McMain told Chad Wood—who drove the garbage truck on September 5—that McMain had previously worked garbage-truck duty for the city, apparently as a civilian. Wood Deposition (DN 65) at 46–47.

On September 4, 2018, McMain was assigned with other inmates to collect tree limbs at the Bill Monroe Homeplace (a museum outside Hartford). Wright Deposition at 27. According to a fellow inmate, Jacob Fuqua, McMain took multiple breaks while working because he was dizzy and sweating profusely, even in air conditioning. Fuqua 9/4 Statement (DN 76-15); Fuqua 9/11 Statement (DN 76-16).[2] McMain collapsed once during that shift and told Fuqua about a weird feeling in his chest. The crew ended its shift and returned to the jail early because of McMain's health issues. Fuqua 9/4 Statement.

After returning to the jail, Fuqua told OCDC staff about McMain's health issues—even though McMain asked Fuqua to keep quiet so McMain could remain on work detail. *Id.* Fuqua described McMain's fall to Jameson (the deputy jailer), who then checked on McMain. Jameson Deposition at 7. McMain told Jameson that he felt fine, although it was common for inmates to lie in order to keep their work privileges. *Id.* at 7–9. Jameson ascribed the issue to dehydration, discussed the incident with the jailer, and did not expect McMain to work the following day given the lack of clean-up work at the park. *Id.* at 7–8. Wright did not pull McMain off the work-release list or inform the next deputy in charge of work release about the incident. Noffsinger Deposition (DN 67) at 20–21.

This was not McMain's first medical issue. His mother, Andrea Bullock, noticed his symptoms of schizophrenia starting around age 12. Bullock Deposition (DN 76-2) at 2, 9. He later received a formal schizophrenia diagnosis, and this mental illness interfered with his schooling and work. *Id.* at 10–11, 13. He took prescription

---

[2] Fuqua himself died before the parties deposed him. *See* Response to City MSJ (DN 76) at 10. But he made two written statements to OCDC staff regarding the September 4 incident. The first was dated September 4, immediately after Fuqua worked with McMain and before McMain's death the next day. DN 76-15. The second was dated September 11. DN 76-16. The defendants don't cite any caselaw that would require exclusion of this material. And in any event, the Estate can't carry its burden on summary judgment even considering these notes under Rule 56(c).

3

medication to treat this condition, and notified OCDC of his diagnosis and medications (at least 10 in total) when he was incarcerated. McMain Medical Intake Form (DN 76-4); *see also* OCDC Medication Reconciliation Form (DN 74-5). Nothing in the record indicates any potential side effects of these medications related to McMain's mental or motor functions. OCDC staff recorded his medications and their frequency. *See* OCDC Medication Reconciliation Form. Both the jailer, Wright Deposition at 27, and deputy jailer, Jameson Deposition at 9–10, were aware that he took medications; however, only Jameson had reviewed his medical record and knew he was being treated for schizophrenia. *Id.*; Wright Deposition at 33. No evidence suggests McMain failed to take any of his medications before his death, or that prison staff were aware of any side effects that might endanger McMain on a work site.

### C. September 5: McMain's death

In the early morning of September 5, Chad Wood of Hartford's maintenance department traveled to the jail to pick up two inmates to work with him on the city garbage truck. Wood Deposition at 21. Typically, Wood selected the same two inmates to work the truck every day, but one of the regulars was unavailable because of a court date. *Id.* at 42. So the deputy jailer on duty (Noffsinger) reviewed the work-release list and picked McMain as the substitute. Noffsinger Deposition at 14. The deputy didn't perceive any signs of physical or mental distress from McMain, who expressed his excitement to get outside and work. *Id.* at 38.

Wood signed out McMain at 6:00 AM and took him to the city maintenance department. Jail Sign Out Sheet (DN 76-18); Wood Deposition at 23. Before beginning garbage duty, Wood asked McMain if he had good grip capable of holding on to the garbage truck. Wood Deposition at 23. After McMain said he did, Wood showed him where and how to stand on the truck, where and how to grip the railing, and how to operate the pullies and levers on the vehicle. *Id.* at 17, 23–24; 47–48. Wood also told McMain not to dismount from the truck until it comes to a complete stop. *Id.* at 23–24. Before starting the route, Wood did not observe any signs that McMain was physically or mentally incapable of working on the truck safely. *Id.* at 44–45.

The day began without any apparent issues. McMain rode on a platform alongside the rear of the driver's side of the truck. Matthews Deposition (DN 69) at 13. The crew stopped for water breaks on three occasions during the route. Wood Deposition at 39. During these breaks, McMain apparently did not exhibit any health issues. *Id.* at 47. Wood thought that McMain was working well. *Id.*

Around 7:55 AM, the truck slowed down and turned right from U.S. Highway 231 into a parking lot. *Id.* at 28. Before making the turn, Wood checked both mirrors and saw McMain holding on to the truck; after the turn, Wood checked his mirror and saw that McMain was no longer there. *Id.* at 28–29. Wood stopped, ran to the rear,

4

and saw McMain lying in the roadway. *Id.* at 29. Wood then radioed his supervisor, Jason Geary, who called 9-11. *Id.* at 30. When Wood returned, he found McMain "tremoring," shaking, and unconscious. *Id.* at 49.

Susan Matthews, a nurse in Hartford, happened to be driving behind the garbage truck on her way to work that morning. Matthews Deposition at 11–13. She saw McMain riding on the back of the truck before the turn. *Id.* at 37. The truck was driving "slow[ly]" before the turn—about 25 miles per hour in her estimation. *Id.* at 14–15. Matthews was about two car-lengths away and "basically stopped" when the truck turned into the parking lot. *Id.* at 45. She saw McMain lose his grip "for some reason," pirouette through the air as the turn was being made, and hit the ground. *Id.* at 39. Matthews stopped, ran to McMain, noticed blood coming from his head, and instructed bystanders not to touch him until EMS could arrive. *Id.* at 18–19. Matthews did not see McMain wearing gloves, a helmet, or a safety vest, *id.* at 23, 41–42, though Wood said that he provided McMain with work safety gloves, Wood Deposition at 22.

EMS arrived and took McMain to the Ohio County Hospital, which then transferred him by helicopter to Vanderbilt Hospital. Wright Deposition at 48. He was pronounced dead at the Vanderbilt Hospital that day. *Id.* at 49. After McMain's death, OCDC and the city suspended the use of inmates for garbage truck duty on safety grounds. *Id.* at 59–60.

## II. Analysis

All the defendants have moved for summary judgment: Wright (DN 70)[3] separately from the remaining City defendants (DN 72). Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). While the Court must view the evidence in the light most favorable to the Estate, as the non-movant, *Green v. Burton Rubber Processing, Inc.*, 30 F. App'x 466, 469 (6th Cir. 2002), the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

---

[3] The Estate also sued "unnamed/unidentified employees of the Ohio Country Detention Center," as set forth in the Second Amended Complaint. Wright's motion seeks summary judgment on behalf of these unnamed and unidentified defendants, though it doesn't discuss them or the claims against them in any specific manner. Because the Estate has not identified these defendants or outlined any claims against them in response, summary judgment is warranted for these defendants. In any case, these claims would fail for largely the same reasons that summary judgment is warranted in favor of Wright.

The Estate pursues the same claims against all defendants: they violated McMain's Eighth Amendment right to be free from cruel and unusual punishment, violated his right not to be treated arbitrarily under Section 2 of the Kentucky Constitution, and were negligent under Kentucky law. Second Amended Complaint (DN 37) ¶¶ 20–30.[4]

### A. Federal Claims

**1. Chad Wood.** The Estate argues that Wood violated McMain's Eighth Amendment rights because, as the driver of the garbage truck, he was deliberately indifferent to McMain's safety. In particular, the Estate contends Wood should have inquired about McMain's health before placing him on the truck, and that Wood also failed to provide McMain with proper training and safety equipment (although this training-and-safety claim, too, is effectively abandoned in light of the failure to support it in response to summary judgment). Response to City MSJ at 19–20; Second Amended Complaint ¶¶ 21–22.

The Eighth Amendment prohibits the infliction of cruel and unusual punishments. U.S. CONST. amend. VIII. This provision has been interpreted to require prison officials to "provide humane conditions of confinement" including "reasonable measures to guarantee the safety of inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quotation omitted). Courts have applied this requirement to the conditions governing prison work programs. *Rhodes v. Michigan*, 10 F.4th 665, 674 (6th Cir. 2021). To establish a constitutional violation based on failure to prevent harm to an inmate, litigants must satisfy two conditions: (1) the alleged deprivation must be objectively and sufficiently serious, and (2) the official must have been deliberately indifferent to the inmate's health or safety. *Farmer*, 511 U.S. at 834. Deliberate indifference is a subjective standard, requiring the defendant to "kno[w] of and disregar[d] an excessive risk to inmate health or safety." *Zakora v. Chrisman*,

---

[4] In its complaint, the Estate also argued that the defendants violated McMain's Fourteenth Amendment Due Process rights. The Estate failed to respond to the defendants' motions for summary judgment on this claim, aside from a single conclusory sentence asserting that McMain's Fourteenth Amendment right was clearly established. *See* Response to City MSJ at 24; Response to Wright MSJ (DN 74) at 23. Such a de minimis and non-substantive response leaves the Fourteenth Amendment claim effectively abandoned. *See, e.g.*, *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013).

In any event, the Estate hasn't offered any response to the defendants' position that a Fourteenth Amendment claim is barred by an Eighth Amendment claim like the one pursued by the Estate. *See* City MSJ at 18. The Estate has also effectively abandoned its failure-to-train and wrongful-death claims (to the extent they differ from the negligence claim) by not offering any independent support for such liability aside from its argument in support of the common-law negligence claim.

44 F.4th 452, 472 (6th Cir. 2022) (quoting *Rhodes*, 10 F.4th at 674–75). McMain's Estate argues that Wood's actions satisfy this standard.

No evidence in the record shows that Wood knew enough about any of McMain's health issues to have been deliberately indifferent toward the risks they may have posed. Deliberate indifference requires actual knowledge that a decision will pose a significant risk to the plaintiff. Nothing indicates that Wood was aware that McMain either had schizophrenia or had trouble breathing the day before—even assuming those health issues would potentially make garbage collection dangerous and that Wood should've realized that risk. Wood's unrebutted testimony is that he did not notice (or otherwise know) that McMain was in physical or mental distress. Wood Deposition at 44–45. Indeed, the Estate itself asserts only that Wood failed to *inquire* about McMain's health. Response to City MSJ at 20. But the Estate never explains, and no other evidence indicates, why Wood should've known to inquire into McMain's health.

As to training and equipment, Wood testified that he did in fact train McMain on how to safely operate the truck safely and inquired into McMain's grip. Wood Deposition at 23–24. Neither the Estate nor anything in the record indicates what further concrete steps the law required Wood to take. And while Wood's instruction was brief, to be sure, the Estate identifies no reason why lengthier instruction or closer supervision were required—or what that would have looked like. Nor does the Estate explain how additional equipment (such as vests or headgear) would've improved safety generally or specifically prevented McMain's injury. No record evidence would support a finding that this training was so insufficient that it placed McMain at an "objectively intolerable risk of harm." *Farmer*, 511 U.S. at 846.

Moreover, no evidence suggests that Wood was aware that this training regimen was insufficient and created an intolerable risk. After all, the work-release program had only a single previous accident of any type, which did not relate to any sort of fall from the garbage truck. Wright Deposition at 51. Given the absence of previous safety incidents, there is insufficient evidence that Wood's alleged failure to equip placed McMain at an intolerable risk of harm, or that Wood was actually aware that it would endanger McMain in this way. *See Reedy v. West*, 988 F.3d 907, 915–16 (6th Cir. 2021) (no basis to infer that the defendant must have known of the alleged substantial risk absent a pervasive record indicating the risk).

Causation poses another challenge for the Estate. To succeed on a § 1983 claim, it must also establish that Wood's deliberate indifference caused McMain's injuries. *McKinley v. City of Mansfield*, 404 F.3d 418, 438 (6th Cir. 2005). Causation under § 1983 tracks notions of actual and proximate causation in the common law sense. *Id.* Both forms are required to establish liability. *Cameron v. City of Pontiac*, 813 F.2d 782, 784 (6th Cir. 1987). If this case proceeded to trial, a jury could only

speculate on what caused McMain's death and whether that cause was attributable to the defendants.

Even assuming that Wood violated McMain's Eighth Amendment rights on one of the grounds discussed above, no evidence in the record could support a reasonable jury verdict that Wood's indifference caused McMain's fall. The Estate itself toggles between two theories throughout its briefing, arguing both that he lost his grip due to improper equipment and training, and that he suffered some form of a medical issue that Wood should have anticipated. But no expert testimony addresses the cause of McMain's fall, and the only eyewitness testimony (from Matthews) says nothing about the cause of the fall—only that Wood appeared to be driving safely.

What about Fuqua's notes about McMain's fall the day before? Those offer extremely limited (if any) help to the Estate because they don't indicate the cause of the fall or any reason why this posed an apparent danger again on September 5. After all, McMain volunteered for work and tried to hide the information from the jailers. Jameson Deposition at 6–8. It is also unclear whether the cause of the September 4 incident was heat and dehydration or some other medical problem. *See id.* at 7.

Finally, no other evidence has been presented that McMain had a medical episode on the 5th. The mere existence of an injury does not allow courts (or juries) to infer causation from a supposed violation—at least not unless the violation is linked by evidence to that injury. *See Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 614 (6th Cir. 2004) (causation is not established if "the causal link … is insubstantial, unforeseeable, speculative, or illogical"). And the Estate hasn't supported a finding of any violation *or* causation.

**2. Jason Geary & George Chinn.** The Estate also claims that two city officials, Jason Geary and George Chinn, violated McMain's Eighth Amendment rights because they did not provide adequate safety equipment or implement policies to ensure that inmates are properly trained and supervised. Response to City MSJ at 21–22. Geary, as the head of the city maintenance department, and Chinn, as mayor, allegedly acted with deliberately indifference by failing to implement these policies. And although the claims are not clear, the Estate at least suggests that these defendants are also liable for directly causing McMain's death, in addition to their more clearly pled claims of supervisory liability. *Id.* at 20.

Geary and Chinn defend, persuasively, on the basis that qualified immunity protects them as public officials from civil liability based on their discretionary functions. *See Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999). Both Geary and Chinn were acting in a discretionary rather than ministerial capacity when they acted as municipal policymakers. That is, the law did not "specif[y] the precise action that the official must take" in overseeing the prison-work program (to the extent they were involved at all). *Hudson v. Hudson*, 475 F.3d 741, 744 (6th Cir. 2007) (quoting

*Davis v. Scherer*, 468 U.S. 183, 196 n.14 (1984)). The Estate identifies no clear legal command that Chinn (in his position as head of the city government and liaison to the city council) or Geary (in his position of direct authority over maintenance employees) failed to implement. Rather, the Estate argues that these defendants should have proactively used their authority—that is, their discretion—to implement better safety policies. Response to City MSJ at 22.

So the Estate may only hold Geary and Chinn liable for these discretionary actions if it proves they violated "a clearly established … righ[t] of which a reasonable person would have known." *Hudson*, 475 F.3d at 744 (quotation omitted). And the Estate has failed to establish that the defendants violated a constitutional right, much less one that was clearly established.

This record could not support a jury finding that either defendant failed to implement equipment or training policies in a manner that created an objectively serious risk, or that they were aware that the absence of a policy would create a significant risk. The Estate contends—in generic fashion—that the defendants should have implemented policies requiring training records, ensuring the provision of safety equipment and ensuring supervision of the lower-level employees tasked with training inmates. Response to City MSJ at 21–22. And it argues that the defendants "knew the risks" of failing to implement these nondescript "policies" to McMain and other inmates like him. *Id.* at 22.

But no evidence shows that Geary or Chinn were even aware that McMain went out on work release duty on September 5 or (in Chinn's case) had any other direct involvement in the work-release program. Chinn Deposition at 11–12. And the safety record of the work-release program before McMain's death was nearly unblemished—only a single accident, involving a needle in a garbage bag. No expert testimony or other information indicates that the mayor and maintenance head should've known to establish policies that would've avoided serious risks to inmate safety of the sort that befell McMain. Moreover, given the safety record (and lack of any other evidence regarding inmate safety risks before this incident), nothing indicates they should've been aware of the need to alter the program or its practices.

Nor are Geary or Chinn liable under a supervisory theory. To establish supervisory liability under § 1983, the Estate must show that the defendants were involved in "active unconstitutional behavior." *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016) (quotation omitted). Respondeat superior liability is not available under § 1983; the plaintiffs must show "[a]t a minimum … that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quotation omitted).

To start, the Estate has not shown that Wood violated McMain's constitutional rights, so it cannot establish supervisory liability based on Wood's actions. *See McQueen v. Beecher Cmty. Schools*, 433 F.3d 460, 471 (6th Cir. 2006) ("Without an underlying constitutional violation, [the plaintiff] cannot maintain her supervisory … claims."). Even assuming Wood violated McMain's rights, however, no evidence indicates that the defendants "authorized, approved, or knowingly acquiesced in" it. *Id.* at 470 (quotation omitted). Supervisory liability is generally limited to circumstances in which "the supervisor had existing knowledge of the specific type of conduct that led to a plaintiff's injuries." *Crawford v. Tilley*, 15 F.4th 752, 767 (6th Cir. 2021). Here, nothing supports the notion that Geary or Chinn knew whether the training, equipment, or supervision provided to inmates for garbage collection (or any other type of work release) was dangerously inadequate. Nor can the Estate show that the defendants were specifically involved in the violation here: A claim based merely on the supervisory relationship between a municipal official and a program or employees under their purview is insufficient to establish liability. *Peatross*, 818 F.3d at 241.

Certainly the Estate has not demonstrated that Geary or Chinn violated any clearly established right. No "existing precedent" identified by the Estate (or by the Court) "place[s] the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quotation omitted). To defeat immunity, the law must have been sufficiently settled at the time of the violation that it would be "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

The Estate points to a single decision: *Campbell v. City of Springboro*, 700 F.3d 779, 790 (6th Cir. 2012). *Campbell*, it maintains, stands for the proposition that the defendants violated a clearly established right by failing to train, equip, and supervise Wood. Response to City MSJ at 23. This opinion purportedly made clear that the defendants should have implemented some undescribed but theoretically more thorough safety policies. But *Campbell* involved dog bites and police, not garbage trucks and prisoners. There the court of appeals held that a supervisor was "oblivious" to an "increasing frequency of dog-bite incidents" and "ignored … many complaints" regarding inadequate training. 700 F.3d at 790. Dog bites have little if anything to do with work-release programs, and the Supreme Court has instructed lower courts to examine the right in question at a far more discrete level of specificity. *Saucier*, 533 U.S. at 201–02 (requiring analysis in "specific context of the case"—not at the level of "general proposition[s]"). And the record indicates the absence of a pattern of inmate accidents (or even complaints)—not the existence of a pattern that Geary or Chinn ignored. So *Campbell* is not analogous, any alleged right to greater supervisory protection was not clearly established, and qualified immunity therefore defeats the Estate's claim.

**3. Gerry Wright.** Gerry Wright, the OCDC jailer, also allegedly violated McMain's rights under the Eighth Amendment based on his supervisory role. Response to Wright MSJ at 19–21. The Estate argues vaguely that Wright acted with deliberate indifference to McMain's safety when, in light of unspecified unconstitutional practices by the jail, he allegedly failed to provide "proper" training or implement "proper" supervisory protocols. *Id.* at 20–21. The Estate further contends that Wright was deliberately indifferent in approving McMain for work release while (allegedly) aware that McMain's medical conditions made it dangerous for him to work without taking steps to account for the risks those conditions posed. *Id.* at 20.

To start, Wright is not liable under a supervisory theory because the Estate has not demonstrated any violation of McMain's rights by a subordinate jail employee. *See McQueen*, 433 F.3d at 471. Indeed, the Estate has not identified any specific violation of McMain's rights by a subordinate employee that it alleges to have occurred on Wright's watch. Nor has the Estate even *alleged* a constitutional violation by any identifiable jail employee other than Wright himself. How could this establish Wright's own supervisory liability? The Estate, for example does not maintain (much less support with record evidence) the position that Wright supervised Wood, who worked for a different municipal department.

Did Wright directly violate McMain's Eighth Amendment rights by approving him for work release and by failing to implement "proper" policies for the program's training and supervision? The Estate argues that Wright was directly responsible for such a violation. *See* Response to Wright MSJ at 20–21; Second Amended Complaint ¶¶ 20–25. But this claim fails, too.

As to work-release approval, the Estate has not identified any evidence that Wright "knowingly and unreasonably disregard[ed] an objectively intolerable risk of harm." *Farmer*, 511 U.S. at 846. While the Estate has demonstrated that Wright was aware that McMain took medications, it provides no evidence that these medications had potential side effects that made it dangerous for McMain to work, let alone that Wright was aware of any potential side effects or any risk they posed that might manifest if Wright granted McMain's request to leave the jail for work. McMain himself asked at least twice to participate. Wright Deposition at 26; Wood Deposition at 46–47. And nothing suggests McMain was off his medications, or that Wright knew this or its theoretical effect, or that this caused McMain's fall.

As to Wright's alleged failure to implement training policies for work-release participants, OCDC did not operate its own training program for inmates or provide inmates with any work equipment. Instead, the jail allowed inmates to volunteer for work under the supervision of the city. The Estate has identified no evidence or opinion testimony that allowing the city to instruct inmates on their various tasks endangered inmates, or that Wright himself was aware of any such danger. Indeed,

11

given that maintenance workers likely have greater familiarity with the relevant equipment and technique, and that the record shows Wood did in fact offer instruction to McMain, the record indicates that this approach, if anything, would improve safety in aggregate. The program's safety record lends support as well. Nothing suggests that Wright knew the training program created a risk that the law required him to address through additional training, yet deliberately ignored that risk by not doing so.

Finally, even assuming that Wright violated McMain's constitutional rights, the Estate has not shown that the right was clearly established. The actions Wright allegedly took were discretionary rather than ministerial in nature: no law dictated how he was to operate a work-release program in the face of inmate-specific health risks. *See Tate v. Coffee County*, 48 F. App'x 176, 177–78 (6th Cir. 2002) (applying qualified immunity to jailer on claim asserting failure to implement training policies). To defeat qualified immunity, therefore, the Estate bears the burden of showing that existing doctrine established the right at the time of the violation. But the Estate does not present *any* caselaw indicating that McMain had a clearly established Eighth Amendment right that required the jail to hold him out of work release or provide work training. Because it must show that existing case law places the illegality of the conduct beyond debate, *see Kisela*, 138 S. Ct. at 1152, the Estate's claim therefore fails to defeat qualified immunity as well.

**4. City of Hartford.** Finally, the Estate claims that the City of Hartford is liable for the constitutional violations of its employees (Wood, Geary, and Chinn). Response to City MSJ at 24–27. To establish municipal liability under § 1983, the Estate must show that a municipal policy inflicted the injury by acting as the "moving force" behind the constitutional violation. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978).

The Estate asserts that *Monell* liability is proper because the city had a policy or custom of deliberate indifference to hiring, training, and supervision which led to the violation of McMain's rights. *See City of Canton v. Harris*, 489 U.S. 378, 389–90 (1989). The Estate argues that the city failed to train its employees on how to properly train, supervise, and equip inmates, leading to employee failures that caused McMain's death (a theory of liability effectively identical on this record to the description of supervisory liability rejected above). And this theory fails for the same basic reasons.

The Estate has not identified evidence that would either show that (1) the municipality failed to act in response to repeated complaints of constitutional violations by officers or (2) the need for a particular type of training was so obvious and so likely to result in a violation of constitutional rights that the failure to train amounted to deliberate indifference even without a pattern of complaints. *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 287 (6th Cir. 2020).

No evidence in the record reveals repeated complaints about the safety of the work-release program or the inadequacy of its employees; indeed, the record indicates that safety incidents have been rare. Nor does the record indicate that the city's alleged failure to formally train its employees (in what manner, the Estate does not say) would obviously lead those employees to endanger inmates by themselves failing to train and supervise adequately. The Estate has not identified the contours of the training program sought or demonstrated how Wood's training and supervision would have been different after participating in a "training program" from the city. Response to City MSJ at 26. In fact, the Estate has not even demonstrated that Wood, or any other line employee, actually provided inadequate training or supervision to inmates.

In addition, and as discussed above, *see* Section II.A.2, the Estate has not explained how any failure to train caused McMain's death. So it cannot demonstrate that a different city policy would have prevented McMain's injuries. It has not provided expert testimony or other evidence suggesting that different equipment would have saved McMain's life. So the Estate has failed to demonstrate that any failure to train was the cause of McMain's constitutional injury.

### B. State-law claims

McMain's Estate also asserts claims under the Kentucky Constitution and state negligence law. In light of the Court's rejection of the Estate's federal claims, the first question is whether to continue to exercise supplemental jurisdiction. *See* 28 U.S.C. § 1367(c). Federal courts may exercise this residual jurisdiction only if "the interests of judicial economy and the avoidance of multiplicity of litigation outweigh our concern over needlessly deciding state law issues." *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) (quotation omitted). Here, judicial economy warrants this Court's resolution of this case for several reasons—chiefly the substantial overlap of factual issues between the state and federal claims, the clarity of those issues at this stage, the length of these federal proceedings, the absence of novel state-law issues, and the unnecessary expense of renewed briefing and factual development in state court. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 357 (1988) (federal courts have discretion to "best serv[e] the principles of economy, convenience, fairness, and comity"). So the Court exercises its jurisdiction to rule on the state-law claims simultaneously with the federal claims.

In response to the Estate's negligence claims, the defendants assert that they are protected by qualified official immunity. Under Kentucky caselaw, a public official is protected from negligence liability if he can show: (1) that he was acting in a discretionary function, (2) his actions were taken in good faith, and (3) his actions were taken within the scope of his employment authority. *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001).

All the defendants are entitled to these protections. The Estate does not contest that any acted in bad faith or outside of the scope of their employment. So the principal question regarding state immunity is whether the defendants acted in discretionary functions when they took the actions the Estate describes as negligent.

Immunity precludes a finding of liability against the so-called supervisory defendants. A function is considered discretionary if it involves "the exercise of discretion and judgment, or personal deliberation, decision, and judgment." *Yanero*, 65 S.W.3d at 522. The Estate's allegations against Geary and Chinn challenge their exercise of discretionary functions: decisions about the contents of training and supervision that involve judgment calls about policy. *Finn v. Warren County*, 768 F.3d 441, 449 (6th Cir. 2014) (decisions about the "content of policies and training" at a jail are discretionary under Kentucky law) (quotation omitted). And the decision to allow McMain out on work release was an exercise of Wright's judgment about how to properly supervise and manage a particular inmate, which is generally discretionary under Kentucky law. *See Rowan County v. Sloas*, 201 S.W.3d 479–80 (Ky. 2006) (jailer performed discretionary functions in asking prisoners "whether they can or can't do the job", "assign[ing]" them "duties," and supervising their highway work).

In any event, these defendants were not negligent. The Estate contends that Geary and Chinn failed to provide adequate safety equipment. Response to City MSJ at 28.[5] It also argues that Wright was negligent because he approved McMain to participate in work release, allowed him to go out on the truck, and failed to provide adequate training and supervision. Response to Wright MSJ at 25.

Kentucky follows the standard approach to negligence, requiring that the plaintiff show: (1) the existence of a duty of care owed by the defendant, (2) conduct constituting a breach of that duty, (3) resultant injury, and (4) causation between the breach and the injury. *Lewis v. B & R Corp.*, 56 S.W.3d 432, 436–37 (Ky. Ct. App. 2001). To establish causation, the plaintiff must show that the breach was both the actual and proximate cause of the injury. *Id.* at 437.

For many of the reasons discussed above, no record evidence would support a reasonable jury determination that not providing additional safety equipment, training, or supervision was negligent. *See* Section II.A. And while negligence is of course a lower standard than deliberate indifference, the Estate has presented no

---

[5] In its response to the city defendants' motion for summary judgment, the Estate cursorily purports to renew its negligence claims against all defendants. It does not, however, provide any arguments for why Mayor Chinn may have been negligent. So the Estate has abandoned its potential group negligence claim against Chinn. *See VHS of Mich.*, 545 F. App'x at 372. Regardless, the record shows that Chinn is protected by qualified immunity as described above.

14

evidence and minimal argument that these defendants breached their duty of care or that any breach caused McMain's injury. Nor could the record support a finding that Wright negligently approved McMain for work release, given that he did so *before* the events on September 4 and without any knowledge that McMain's schizophrenia or other condition(s) might put him at an intolerable risk despite McMain's desire to work outside the jail. Wright Deposition at 27–28.

The claims against Wood differ somewhat. The Estate asserts that Wood was negligent both because he failed to safely equip McMain and because he was negligent when he drove the truck. Response to City MSJ at 29. Wood was supervising inmates on work release duty, which is generally a discretionary function. *Sloas,* 201 S.W.3d at 477–80. And the Estate doesn't point to any evidence or caselaw indicating that the selection of safety equipment was ministerial in the sense of being dictated by law. *See Finn*, 768 F.3d at 449 (noting that inmate supervision is discretionary under Kentucky law when it involves the "duty to anticipate prospective harm" and ministerial when it involves the "duty to follow instructions"). As to driving, however, the Kentucky Supreme Court has held that negligent driving by a police officer is a ministerial act, even in an emergency situation. *Jones v. Lathram*, 150 S.W.3d 50, 53 (Ky. 2004). By analogy, Wood's allegedly negligent driving was also ministerial.

The "enforcement of a well known rule for safety" may also be ministerial. *Sloas*, 201 S.W.3d at 478 (citing *Yanero*, 65 S.W.3d at 529) (discussing the "batting helmet rule"). The Estate identifies no unwritten customary policy *or* formal written safety regulation that Wood allegedly violated. *Yanero*, 65 S.W.3d at 529. Multiple defendants, however, testified that it was ordinary practice to provide inmates with gloves and safety glasses. Geary Deposition at 11; Wood Deposition at 22. Following this standard practice would be a ministerial act under *Yanero*'s "batting helmet rule*." See Sloas*, 201 S.W.3d at 478.

Yet the record contains no evidence that would support a jury finding that Wood drove the truck in a negligent manner or negligently failed to provide him with proper equipment. First, the negligent-driving claim is not supported by any record evidence. The only witness that recalls Wood's driving at the time of the incident testified that he drove appropriately and made the turn safely when McMain fell from the truck. Matthews Deposition at 14–18. No other evidence supports the contention that Wood's driving breached the duty of care, much less caused McMain's injury. Similarly, nothing in the record indicates that Wood could be held liable for McMain's death even if he failed to provide McMain with gloves. At best, the Estate disputes whether Wood provided McMain with gloves. Response to City MSJ at 29; Geary Deposition at 15–16; Matthews Deposition at 41. Even assuming he didn't, no evidence indicates that McMain fell due to inadequate grip or that proper gloves would have prevented the fall. The record is simply silent regarding whether this or

15

any other material caused McMain's death. So summary judgment is warranted on the negligence claims against Wood as well.

Finally, the Estate initially asserted a claim against the defendants under Section 2 of the Kentucky Constitution. The response to the summary-judgment motion offers barely any support for this claim, however, suggesting that the Estate simply abandoned it. In any event, the Estate has not demonstrated a basis to bring this claim, and Kentucky law does not provide a cause of action for constitutional damages analogous to § 1983 or *Bivens*. *St. Luke Hospital, Inc v. Straub*, 354 S.W.3d 529, 536–37 (Ky. 2011). As a result, these claims are barred.

### III. Conclusion

Despite the tragic and unfortunate nature of McMain's death, the law prevents the Court from allowing these claims to proceed to trial because no reasonable jury could decide—on this record—that the defendants violated state or federal law in a manner that caused his death or overcame their official immunity. Therefore the Court grants the defendants' motions for summary judgment (DNs 70 & 72) on all claims for all defendants.

Benjamin Beaton, District Judge
United States District Court

September 30, 2022